UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| 737 NORTH MICHIGAN AVENUE INVESTORS LLC, a limited liability company,<br><br>    Plaintiffs,<br><br>v.<br><br>THE NEIMAN MARCUS GROUP, INC., a Delaware corporation,<br><br>    Defendant. | No. 06 C 6379<br><br>Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

Plaintiff, 737 North Michigan Avenue Investors LLC ("NMAI"), filed suit against Defendant. Count I seeks a stay of arbitration, and Count II alleges a breach of contract claim. Presently before the Court is Defendant's Motion to Compel Arbitration and to Stay Proceedings Pending Arbitration.

### BACKGROUND

NMAI is a Delaware limited liability company. NMAI has the citizenship of its sole member, Aetna Life Insurance Company, a Connecticut corporation with its principal place of business in Connecticut. NMAI owns the garage, retail, and office components of the building located at 737 North Michigan Avenue ("Building") and is the landlord of the retail space. The Neiman Marcus Group, Inc. ("Neiman") is a Delaware corporation with its principal place of business in Texas and is the tenant of the retail space.

In 1981, LaSalle National Bank, as Landlord of the retail space in the Building, entered into a lease with Carter Hawley Hale Stores, Inc., as Tenant.[1] In 1984, a Restated Lease

---
[1] Carter Hawley Hale Stores, Inc is Neiman's parent company.

Agreement was executed, which is the subject of the instant dispute ("Lease"). In 1987, Carter Hawley Stores, Inc. assigned its interest as Tenant under the Lease to Neiman. In 1998, NMAI acquired the Landlord's interests under the Lease, including the garage, retail, and office space in the Building.

Under the Lease, Neiman is required to pay a "Base Rent" as well as a "Percentage Rent" that is "equal to four percent (4%) of annual Gross Sales made in, upon or from the Leased Premises during each lease year of the term of the Lease in excess of" a certain yearly threshold amount. Section 4.7 of the lease defines "Gross Sales" to mean "the entire gross receipts of every kind and nature from the sales and services made in, upon or from the Leased Premises . . . excepting therefrom (i) and rebates, returns, discounts, trade-ins, allowances and/or refunds to customers, whether from cash or credit . . ." The Lease provides that the Landlord has the right to audit the Tenant's records to determine the accuracy of the annual Gross Sales. As part of the most recent audit conducted under Section 4.8 of the Lease, NMAI's auditors discovered evidence that Neiman's stated figure for "Gross Sales" did not conform to the Lease definition. Specifically, Neiman took deductions from Gross Sales for returns of items that were not demonstrably sold "in, upon or from the Leased Premises," including items sold in Neiman's catalog, on the internet and at other Neiman locations. Pursuant to Section 4.8, NMAI and its auditors requested that Neiman provide additional information needed to properly calculate Gross Sales, but Neiman has refused to provide such information. NMAI's auditors were, therefore, unable to complete their audit; but the auditors estimated that Neiman understated its Gross Sales by several million dollars per year. This understatement would equate to an additional percentage rent ranging from $150,000 to $450,000 per year.

In addition to the percentage rent dispute, another dispute arose concurrently between NMAI and Neiman regarding the "Building Common Areas Operations Charge," which Neiman agreed to pay pursuant to Article 13 of the Lease and which is not at issue here, as both parties have agreed that the provision is subject to arbitration.

On August 24, 2006, counsel for NMAI sent counsel for Neiman a letter in which he requested information related to the percentage rent dispute and stated that to the extent that Neiman is unwilling to provide the information requested, "we will begin the arbitration process as soon as practicable." On September 6, 2006, counsel for NMAI sent counsel for Neiman another letter in which he stated, "I will get back to you shortly regarding the logistics for the arbitration of [the common areas operations charge dispute] and the dispute regarding the impact of returns on the calculation of percentage rent."

On October 10, 2006, Neiman submitted to the American Arbitration Association ("AAA") an Arbitration Demand that covered both the common areas operations charge dispute and the percentage rent dispute. On October 17, 2006, there was an exchange of emails between counsel for NMAI and counsel for Neiman, in which NMAI's counsel stated, "My client insists on separate arbitrations for the two issues – [common area charge] and percentage rent." Counsel for NMAI also indicated that the issue of whether the disputes should be addressed in one or two arbitrations must be resolved before the disputes could be addressed substantively.

On October 25, 2006, counsel for NMAI sent a letter to the AAA, stating "the parties have agreed to arbitrate both disputes, but NMAI does not believe they should be addressed in the same proceeding." In response, AAA Case Manager Zach Middleton sent both parties a letter, stating "with respect to the issue of severance of claims into separate arbitration

3

proceedings, . . . [i]f the issue is further raised in the answering statement, an additional response may be filed."

On November 13, 2007, NMAI filed a Motion to Dismiss the Dispute Regarding Percentage Rent before the AAA, claiming there was never an agreement to arbitrate the issue. On November 21, 2006, NMAI filed the present lawsuit.

On February 22, 2007, following the briefing of NMAI's motion to dismiss before the AAA, the arbitration panel denied NMAI's motion to dismiss, finding that the parties had agreed to arbitrate both disputes – the building repairs dispute and the percentage rent dispute. The arbitration panel also held that the arbitration evidentiary hearings of the disputes would be bifurcated.

## ANALYSIS

Neiman presently seeks to compel arbitration and to stay the proceedings pending such arbitration.

The Federal Arbitration Act ("FAA") provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Aspects of the present case implicate interstate commerce, including the sale of goods through interstate commerce that are returned to the store subject to the Lease. Accordingly, the FAA applies to the present case.

The FAA embodies the federal policy favoring arbitration. *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225-226 (1987). Whether the parties agreed to

4

arbitrate an issue is generally a question for the court and not the arbitrator to decide. *See AT & T Tech., Inc. v. Communication Workers*, 475 U.S. 643, 649-50 (1986).

The party moving to compel arbitration pursuant to the FAA must demonstrate: (1) the existence of a written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate by another party. *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). The party opposing arbitration must identify a triable issue of fact as to the existence of the arbitration agreement in order to obtain a trial on the merits. *See Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002) (*Tinder*). This standard is analogized to that required to defeat a motion for summary judgment under Federal Rule of Civil Procedure 56(e) – the opposing party must demonstrate a genuine issue of material fact exists warranting a trial. *See Tinder*, 305 F.3d at 735. In determining whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed; and all justifiable reasonable inferences are drawn in favor of the non-movant. *See Tinder*, 305 F.3d at 735.

Arbitration agreements are evaluated under the same standards as any other contract. Thus, whether a binding arbitration agreement exists is determined under the principles of state contract law. *See Tinder v. Pinkerton Security*, 305 F.3d 728, 733 (7th Cir. 2002). The parties agree that Illinois law determines the validity of any arbitration agreement.

Neiman argues that a valid agreement to arbitrate exists as to the percentage rent dispute. Specifically, Neiman argues that the parties memorialized their intent to arbitrate the dispute in multiple correspondence both before and after the arbitration demand was filed.

Under Illinois law, an agreement is generally binding and enforceable where there has been an offer, an acceptance and a meeting of the minds. *City of Chicago v. Ramirez*, 366 Ill.

App. 3d 935, 947 (2006). The test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender. *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995). Here, the attorney for NMAI made an offer to arbitrate the percentage rent dispute in his letter of August 24, 2006, in which he wrote, "If your client is not willing to provide this information by the close of business on August 30, 2006, please tell me and we will begin the arbitration process as soon as practicable." This statement was sufficient to induce a reasonable belief in counsel for Neiman that he could, by not providing the requested information, bind NMAI to arbitrate the percentage rent dispute.

Next, in order for there to be a valid acceptance, the offeree must communicate by reasonable means an assent to the offer. *Carl Soderstrom v. Rock River Valley Pigeon Club, Inc.*, 122 Ill. App. 3d 819, 820 (1984). Plaintiff argues that Neiman's lack of a communicated acceptance renders the agreement to arbitrate the percentage rent dispute unenforceable. Under Illinois law, silence accompanied by inaction is insufficient to constitute acceptance, absent a prior course of dealing. *Regan, et. al. v. AT&T Corp.*, 355 Ill. App. 3d 1143, 1149 (2005). However, here the conduct of counsel for Neiman constitutes more than mere silence and inaction. Counsel for Neiman failed to provide NMAI with any information regarding the percentage rent dispute before August 30, 2006, and then on October 10, 2006, filed a Demand for Arbitration with the AAA, a copy of which was sent to NMAI. These two actions, taken in conjunction, amount to an acceptance of NMAI's offer to arbitrate the percentage rent dispute.

Last, whether the parties had a meeting of the minds is determined not by their actual subjective intent, but by what they expressed to each other in their writings. *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999). The communications before and after the arbitration demand evidence a meeting of the minds

6

between counsel for NMAI and counsel for Neiman. In his letter of October 6, 2006, to counsel for Neiman, counsel for NMAI wrote, "I will get back to you shortly regarding the logistics for arbitration of [the Common Areas Operations Charge] and the dispute regarding the impact of returns in the calculation of percentage rent." Counsel for NMAI then wrote a letter to the AAA on October 25, 2006, in which he stated, "The parties have agreed to arbitrate both disputes." These communications, together with the subsequent e-mails exchanged between counsel for Neiman and NMAI,[2] indicate that there was a meeting of the minds in favor of arbitrating the percentage rent dispute.

NMAI argues that the logistics of the two arbitrations – wanting two separate arbitrations for each of the issues – was a material term of the agreement to which the parties had not agreed. However, based on the parties' correspondences, NMAI's desire to have the two issues arbitrated separately was not a condition precedent to proceeding to arbitration and was not an implied condition of the agreement to arbitrate. *See Titan Group, Inc. v. Anne Arundel County, Dept. of Public Works*, 588 F. Supp. 938 (D. Md 1984) (finding binding arbitration agreement existed via correspondence of the parties and rejecting party's argument that certain "conditions" were material to agreement).

Based on the above, NMAI has failed to demonstrate a genuine issue of material fact exists as to whether a written arbitration agreement exists. Furthermore, the percentage rent dispute is within the scope of the arbitration agreement; and NMAI now refuses to arbitrate that issue. Because the elements of contract formation in Illinois are satisfied, NMAI and Neiman are bound by their agreement to arbitrate the percentage rent dispute.

---

[2] In a series of e-mails on October 17, 2006, counsel for Neiman and counsel for NMAI indicate that an agreement to arbitrate the percentage rent dispute had been reached and only comment on whether this dispute should be bifurcated from the common areas operations charge dispute.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Compel Arbitration and to Stay Proceedings Pending Arbitration is granted.

Dated: April 5, 2007

JOHN W. DARRAH
United States District Court Judge